******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* HECTOR M.[1]
(AC 34642)

DiPentima, C. J., and Gruendel and Lavery, Js.

*Argued November 20, 2013—officially released February 25, 2014*

(Appeal from Superior Court, judicial district of
Waterbury, Cremins, J.)

*Mary Beattie Schairer*, assigned counsel, for the
appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with
whom, on the brief, were *Maureen Platt*, state's attorney, and *Catherine Brannelly Austin*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Hector M., appeals from the judgment of conviction, rendered after a trial to the court, of two counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), two counts of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (2), two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2), and one count of risk of injury to a child in violation of § 53-21 (a) (1). On appeal, the defendant claims that (1) the evidence adduced at trial was insufficient to support his conviction of sexual assault in the second degree, sexual assault in the third degree, and risk of injury to a child, and (2) the conviction of risk of injury to a child under § 53-21 (a) (1) should be dismissed because the statute is void for vagueness.[2] We affirm the judgment of the trial court.

The following evidence supports the trial court's finding of guilt in the present case. The defendant and his biological daughter, Y, began living together in September, 2008, when she was thirteen years old.[3] The defendant was in the military and spoke with Y about "one of his best friends," Estephan Elson, who he claimed had fought at war with him and who also had a daughter, Elizabeth. The defendant told Y that Elizabeth "was sixteen years old . . . and that she had a sexual relationship with her father." The defendant, under the guise of both Estephan Elson and Elizabeth Elson, began communicating with Y through e-mail on a daily basis.

In December, 2009, Y was first approached about her "destiny." The defendant and Y went to visit the grave of Y's grandmother, where the defendant told her, "your grandmother loved me a lot, and I remember one day she had [sat] me and your mother down, and she was telling me that this relationship wasn't going to last. . . . [S]he told me that your mother's going to bring the woman of his life into his life, take her away, and drop her off at his doorstep. And [the defendant] asked [Y] if [she] knew what that meant . . . . And he had told [her] that he was going to ask Elizabeth Elson and Estephan Elson if they understood what it meant. And that very day," Y testified, "Elizabeth Elson, Estephan Elson, had wrote to me in the e-mail, stating what the destiny was about, and the destiny was, it was me, that my mother brought me into his life, took me away, and dropped me off at his doorstep." According to Estephan Elson and Elizabeth Elson, Y's destiny was "to save [the defendant's] life, and his eight soldiers. And a part of that destiny was to be the woman of his life . . . taking care of him, and also having sexual intercourse with [him]."

Y did not want to accept her "destiny," but she testified that "in the e-mails [Estephan Elson and Elizabeth

Elson] kept antagonizing me, saying that my dad was going to die, my sister was going to die and [Estephan Elson] was going to die . . . . [H]e was saying that I don't want that kind of blood on my hands . . . that I'm going [to] regret it for the rest of my life . . . ." Estephan Elson specifically told Y that he went to a priest about Y's destiny, to which the priest allegedly explained to Estephan Elson, who then wrote it in an e-mail to Y, about "the significance of the destiny and . . . how strong the destiny is, and that . . . [it] is going to basically end horribly." Y testified that because of "the way [the e-mail was] written and . . . having to do with God," it made her believe that her destiny was real and that she must fulfill it. It was after all of the e-mails that Y finally agreed to her destiny and to be her "father's woman" because she "did not want [her] little sister to grow up without a father. [She] did not want the eight soldiers . . . [or her] father to die because [she] trusted [the defendant] and [she] believe[d] that what [the defendant, Estephan Elson, and Elizabeth Elson were] saying was true."

Y was advised, by Elizabeth Elson and Estephan Elson, how to complete her destiny—by "rubbing" private parts with the defendant. As Y testified, she was told that "[w]e were to strip into our underwear, I had to wear my bra and my panties and he had to stay in his boxers. And he had to lay his penis on his stomach, and I had to lay on the side of him, and he had to . . . rub . . . my clitoris until I was to get wet and then I had to go on top of him and rub until we both had an orgasm."

On December 29, 2009, when Y was under the age of sixteen, the defendant brought Y and his other daughter to Coco Keys in Waterbury, a hotel and waterpark. On the way, the defendant stopped to purchase Smirnoff green apple and strawberry liquor as well as a box of condoms. After playing at the waterpark and putting the younger daughter to bed, the defendant opened the alcoholic beverages. He provided the Smirnoff to Y, and she testified that she had "a couple of sips" of hers. She did not continue to drink, she testified, because "it just felt weird." Y then put on a new outfit she received for her birthday, and the defendant took photographs of her in the hotel bathroom. He then said, "well, it's getting late, and let's do this already."

Y then "stripped down to [her] bra and panties, and [she] laid right on the side of [the defendant]," and he asked if she was ready. When she said no, the defendant stated, "well, we have to do this," and then he put his hands between her labia majora,[4] rubbing her clitoris. The defendant "grabbed his penis, laid it right on his stomach, and [Y] got on top and [they] just started rubbing." The defendant's penis was, according to Y, touching her "clitoris and . . . between . . . [her labia majora]." Later, the defendant "took off [Y's] pant-

ies and just stuck it in . . . at least two times" until Y pushed him off of her. The defendant ejaculated after touching his own penis while rubbing Y's clitoris. The next morning, the defendant told Y, "you saved us, baby, you saved us."[5]

The defendant thereafter was arrested and charged with the aforementioned crimes. A trial followed, at the conclusion of which the court found the defendant guilty. The court rendered judgment accordingly and sentenced him to a total effective term of twenty-six years imprisonment, execution suspended after fourteen years, with twenty-five years of probation.[6] This appeal followed.

I

The defendant claims that there was insufficient evidence to support his conviction of sexual assault in the second degree, sexual assault in the third degree, and risk of injury to a child. These claims are unavailing.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts [that] establishes guilt in a case

involving substantial circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 656–58, 1 A.3d 1051 (2010).

A

The defendant first claims that there was insufficient evidence of sexual intercourse as a matter of law to support his conviction of sexual assault in the second degree and sexual assault in the third degree[7] because the sexual contact took place through clothing. We disagree.

The defendant was convicted under § 53a-71 and § 53a-72a, both of which require sexual intercourse between the defendant and another person. Section 53a-71 (a) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than three years older than such other person . . . ." Section 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person . . . (2) engages in sexual intercourse with another person whom the actor knows to be related to him or her within any of the degrees of kindred specified in section 46b-21."

General Statutes § 53a-65 (2) defines sexual intercourse as "vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Its meaning is limited to persons not married to each other. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body." Our Supreme Court has commented that there is nothing to suggest that the term genital opening was intended "to require that penetration occur beyond the labia majora to at least the labia minora . . . ."[8] (Internal quotation marks omitted.) *State* v. *Albert*, 252 Conn. 795, 813, 750 A.2d 1037 (2000).

"[B]ecause the statutory provisions that prohibit forcible and nonconsensual sexual intercourse were designed to punish the fact, not the degree, of penetration . . . the least penetration of the body is sufficient to satisfy the penetration element of this state's sexual assault statutes. . . . Accordingly, we . . . have concluded that the penetration element of those statutes is satisfied by the penetration of the labia majora because penetration of the labia majora constitutes penetration of the body." (Citations omitted; internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 630, 835 A.2d 895 (2003). To clarify, "the opening between the . . . labia majora . . . is the genital opening . . . that the labia majora form the boundaries of the genital

opening . . . [and] that . . . penetration, however slight, of the labia majora is sufficient penetration to constitute vaginal intercourse under § 53a-65 (2). . . . [T]he state need not prove penetration of the vagina, but, rather, penetration of the labia majora. . . . Subsequent decisions repeatedly have reaffirmed and applied this conclusion. See, e.g., [id., 630]; *State* v. *Scott*, [256 Conn. 517, 534, 779 A.2d 702 (2001)]; *State* v. *Juan V.*, 109 Conn. App. 431, 449, 951 A.2d 651, cert. denied, 289 Conn. 931, 958 A.2d 161 (2008)." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *David N.J.*, 301 Conn. 122, 159, 19 A.3d 646 (2011).

The defendant's claim of evidentiary insufficiency is predicated on his assertion that the state failed to prove penetration and, consequently, failed to prove that he engaged in sexual intercourse with Y. The defendant argues that sexual contact through clothing is a barrier that prevents "intrusions into the interior," which he claims is required by the plain meaning of the word penetration.

In construing the evidence in a light most favorable to sustaining the court's finding of guilty, we conclude that the court reasonably could have found the evidence to be sufficient to satisfy the penetration element of §§ 53a-71 (a) (1) and 53a-72a (a) (2). Although our appellate courts have not specifically addressed penetration through underwear, or any other type of clothing, our precedent nonetheless provides adequate guidance on this sufficiency claim. Our Supreme Court has explicitly stated that penetration of the labia majora constitutes penetration of the body. See *State* v. *Merriam*, supra, 264 Conn. 630. Y testified that she and the defendant were wearing underwear when the alleged penetration took place, but further testified that the defendant's penis was rubbing between her labia majora and touching her clitoris. Our jurisprudence does not qualify the term "penetration, however slight," to require that the penetration occur without any intervening material. As a result, the court could have reasonably concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt that the defendant engaged in sexual intercourse with Y.[9] Consequently, the defendant's claim of evidentiary insufficiency fails.

B

The defendant also claims that the evidence presented is insufficient to support a conviction of risk of injury to a child for providing alcohol to a minor in violation of § 53-21 (a) (1). We do not agree.

The defendant was charged with violating § 53-21 (a), which provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the

health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony . . . ."

"[Section] 53-21 (a) (1) is broadly drafted and was intended to apply to any conduct, illegal or not, that foreseeably could result in injury to the health of a child." *State* v. *Scruggs*, 279 Conn. 698, 724–25, 905 A.2d 24 (2006). Our Supreme Court "has interpreted § 53-21 (a) (1) as being comprised of two distinct prongs, the situation prong and act prong . . . ." (Internal quotation marks omitted.) *State* v. *Owens*, 100 Conn. App. 619, 635, 918 A.2d 1041, cert. denied, 282 Conn. 927, 926 A.2d 668 (2007). The defendant was charged only under the act prong.

"Under the act prong of our risk of injury statute [t]he four elements the [fact finder] needed to find to return a verdict of guilty are: (1) the victim was less than sixteen years old; (2) the defendant committed an act upon the victim; (3) the act was likely to be injurious to the victim's health . . . and (4) the defendant had the general intent to commit the act upon the victim." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Patterson*, 131 Conn. App. 65, 78–79, 27 A.3d 374 (2011), aff'd, 308 Conn. 835, 68 A.3d 83 (2013).

"[T]he charge of risk of injury to a child does not require proof of an actual injury, but only that the actions of the defendant exposed the victim to a situation that potentially could impair his health. *State* v. *Peters*, 40 Conn. App. 805, 828–29, 673 A.2d 1158, cert. denied, 237 Conn. 925, 677 A.2d 949 (1996). "The relevant inquiry is whether the defendant committed any act that was likely to endanger the life or limb, or impair the health, of the children, not whether the children actually were injured. Lack of an actual injury to either the physical health or morals of the victim is irrelevant . . . actual injury is not an element of the offense. . . . *State* v. *Sullivan*, 11 Conn. App. 80, 98, 525 A.2d 1353 (1987). [T]he creation of a prohibited situation is sufficient. *State* v. *Perruccio*, 192 Conn. 154, 160, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984)." (Internal quotation marks omitted.) *State* v. *Davila*, 75 Conn. App. 432, 437, 816 A.2d 673 (2003), cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004); see also *State* v. *Samms*, 139 Conn. App. 553, 559, 56 A.3d 755 (2012), cert. denied, 308 Conn. 902, 60 A.3d 287 (2013); *State* v. *Patterson*, supra, 131 Conn. App. 79.

Additionally, it is important to note that "[t]he general purpose of § 53-21 is to protect the physical and psychological well-being of children from the potentially harmful conduct of adults." *State* v. *Payne*, 240 Conn. 766, 771, 695 A.2d 525 (1997), overruled in part on other grounds by *State* v. *Romero*, 269 Conn. 481, 490, 849

A.2d 760 (2004). "Furthermore, although § 53-21 (a) (1) is divided into an act prong and situation prong, [i]n both instances, the focus of the statute is on the behavior of the defendant . . . ." (Internal quotation marks omitted.) *State* v. *Owens*, supra, 100 Conn. App. 638.

The defendant argues that the state failed to prove that offering Y "a few sips of alcohol negatively impacted her morals" because she did not drink enough to become intoxicated.[10] Pursuant to the defendant's interpretation, one's culpability would depend on whether a child under the age of sixteen was actually intoxicated or impaired in order for a defendant to be found in violation of the statute. Such a view is at odds with the stated purpose of § 53-21 (a) (1), which is to protect the health and morals of children. It also fails to provide a proper focus on the behavior of the defendant, as our precedent requires. See *State* v. *Owens*, supra, 100 Conn. App. 639.

In the present case, the defendant provided alcohol to a minor prior to sexually assaulting her. "In evaluating whether a situation is likely to impair a victim's morals, the relevant inquiry . . . is to evaluate the situation in light of precepts that are commonly accepted among us as right and decent." (Internal quotation marks omitted.) *State* v. *Eastwood*, 83 Conn. App. 452, 477, 850 A.2d 234 (2004), cert. denied, 286 Conn. 914, 945 A.2d 978 (2008). The court heard sufficient evidence that, if credited, would support its finding that the defendant's actions created a risk of injury to a child under the age of sixteen. Y testified that the defendant bought Smirnoff green apple and strawberry liquor, and provided the alcoholic beverages to her. The fact that Y had only a few sips of the alcohol is irrelevant because she decided, on her own, not to continue drinking. Allowing a defendant to circumvent a charge of risk of injury to a child when the minor chooses not to drink would render § 53-21 an absurdity.

In addition, the present case is akin to *State* v. *March*, 39 Conn. App. 267, 664 A.2d 1157, cert. denied, 235 Conn. 930, 667 A.2d 801 (1995), where a defendant was convicted of risk of injury to a child for giving a four year old a cup containing rum and soda. Despite the difference in age between Y and the victim in *March*, the circumstances are very similar. In *March*, the court upheld the defendant's conviction of risk of injury for providing alcohol to a child under the age of sixteen. Id., 276. In *March*, as in the present case, the child was not impaired after drinking the alcohol. There is no requirement, however, that the state prove an actual injury to the child. Rather, courts are required to focus on the acts committed by the defendant in order to determine whether those acts were likely to endanger the life of the child. See *State* v. *Davila*, supra, 75 Conn. App. 437. In focusing on such acts, the court was presented with evidence that the defendant e-mailed Y,

under the guise of Estephan Elson and Elizabeth Elson, in order to encourage Y to have sexual intercourse with him. Thus, in construing the evidence in the light most favorable to sustaining the finding of guilty, we conclude that the court reasonably could have credited the testimony and the evidence that the defendant bought and provided alcohol to his minor daughter as a prelude to sexually assaulting her.

From that evidence, the fact finder reasonably could have concluded that the defendant's act of providing alcohol to a minor was an act likely to impair her health or morals. The defendant's claim that the evidence was insufficient for a conviction of risk of injury thus fails.

## II

The defendant next claims that the conviction of risk of injury should be dismissed because the statute, as applied, is void for vagueness. This claim is unavailing.

"We begin with the applicable standard of review and general governing principles. The determination of whether a statutory provision is unconstitutionally vague is a question of law over which we exercise de novo review. . . . In undertaking such review, we are mindful that [a] statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied to him, the [defendant] therefore must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . .

"[T]he void for vagueness doctrine embodies two central precepts . . . . First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. . . . [A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law. . . .

"Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications. . . . Therefore, a legislature [must] establish minimal guidelines to govern law enforcement. . . .

"[M]any statutes proscribing criminal offenses necessarily cannot be drafted with the utmost precision and still effectively reach the targeted behaviors. Consistent

with that acknowledgment, the United States Supreme Court has explained: The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. *Colten* v. *Kentucky*, 407 U.S. 104, 110, 92 S. Ct. 1953, 32 L. Ed. 2d 584 (1972) . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Winot*, 294 Conn. 753, 758–61, 988 A.2d 188 (2010).

The defendant did not preserve this issue at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[11] We conclude that the record is adequate to review this claim and that it is of constitutional magnitude. The claim fails under the third prong of *Golding*, however, because the defendant failed to establish beyond a reasonable doubt that risk of injury to a child is unconstitutionally vague as applied to his conduct. He therefore has not established that a clear constitutional violation exists.

The defendant was charged with violating § 53-21 (a) (1). The defendant argues, however, that because General Statutes § 30-86 (b) (3) (C)[12] allows parents to provide alcohol to their children while the parent is present, he lacked fair warning that his conduct was criminal under the risk of injury statute, § 53-21. He concludes that the risk of injury statute is void for vagueness as applied to him. The state contends that a person of ordinary intelligence would know that, under the factual circumstances presented by this case, namely, providing one's minor daughter with alcohol as an antecedent to sexually assaulting her, is illegal.

"Our courts have determined that minors are not competent to assume the responsibility of consuming alcohol." *State* v. *Springmann*, 69 Conn. App. 400, 409, 794 A.2d 1071, cert. denied, 260 Conn. 934, 802 A.2d 89 (2002). Specifically, § 30-86 was "manifestly directed at the eradication, or minimally at the discouragement, of alcoholic indulgence by minors who, lacking self-discipline, fortitude and discretion, and uninformed by their own observation and the experience gained by maturing years, were most likely to fall into habits of dissolute excess and vice, with grave injury to themselves . . . ." *State* v. *Hughes*, 3 Conn. Cir. Ct. 181, 189, 209 A.2d 872, cert. denied, 152 Conn. 745, 209 A.2d 189 (1965).

As we previously have noted, however, providing alcohol to a minor child is appropriate in certain circumstances, such as in religious ceremonies.[13] However, "an adult is required to exercise caution when permitting minors to consume alcohol." *State* v. *Springmann*, supra, 69 Conn. App. 409. If there is a question with respect to the admissibility of providing alcohol to a

minor, "[t]he mischief which the statute was designed to remedy is an important guide in ascertaining its meaning." (Internal quotation marks omitted.) *State* v. *Hughes*, supra, 3 Conn. Cir. Ct. 197.

The application of § 53-21 to the defendant's conduct is constitutional because the statute is not vague as applied to him. First, the defendant was on notice that providing alcohol to a minor could subject him to prosecution under § 53-21. See *State* v. *Springmann*, supra, 69 Conn. App. 400; *State* v. *March*, supra, 39 Conn. App. 267, *State* v. *Mancinone*, supra, 15 Conn. App. 251. Second, § 30-86 does not apply under the factual circumstances of this case. An as applied claim focuses on "the constitutionality of the challenged statute is to be determined by the statute's applicability to the *particular facts at issue*." (Emphasis added.) *State* v. *Perruccio*, supra, 192 Conn. 158. A reasonable person would be on notice that providing alcohol to Y under the factual circumstances of the case, an act that preceded a sexual encounter with a child, was likely to impair her health or morals. The present situation was not one where the defendant was permitting his minor daughter to drink a small amount of alcohol served at the dinner table or in observation of a religious ceremony. Rather, the defendant provided alcohol to his daughter prior to sexually assaulting her.[14]

Moreover, even if the defendant was permitted to provide alcohol to Y under § 30-86, § 53-21 (a) (1) specifically provides that the statute "was intended to apply to any conduct, *illegal or not*, that foreseeably could result in injury to the health of a child." (Emphasis added.) *State* v. *Scruggs*, supra, 279 Conn. 724–25. "[D]eliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and . . . acts directly perpetrated on the person of the minor and injurious to [the victim's] moral or physical well-being" constitute behavior that is prohibited by § 53-21. (Internal quotation marks omitted.) *State* v. *March*, supra, 39 Conn. App. 274–75. Therefore, the defendant's act of providing alcohol to Y prior to sexually assaulting her could foreseeably result in injury to her health, thus rendering § 30-86 inoperable.

A person of ordinary intelligence would be on notice that the aforementioned conduct is illegal. The defendant, therefore, has not demonstrated beyond a reasonable doubt that he had inadequate notice of what was prohibited under our Penal Code. The defendant's claim that the risk of injury statute is void for vagueness thereby fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through

whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] In his appellate brief, the defendant also alleged that the conviction of sexual assault in the second degree and sexual assault in the third degree should be vacated because the relevant statutes are void for vagueness. The defendant withdrew this claim at oral argument, and we therefore do not address it.

[3] Y lived with her mother until such time in 2008.

[4] Y's exact testimony was "between [her vagina] lips," which, as shall be further discussed, is defined as the labia majora.

[5] Y also testified about later sexual encounters with the defendant. The defendant was found not guilty of those charges, and the state did not appeal from those determinations.

[6] By count, the court sentenced the defendant to: thirteen years incarceration, with twenty-five years probation on the first count, sexual assault in the second degree; on the second and third counts, sexual assault in the third degree and risk of injury to a child, respectively, the court sentenced the defendant to five years concurrent with the first count; on the fourth count, sexual assault in the second degree, the court sentenced the defendant to thirteen years, execution suspended after seven years, and twenty-five years probation consecutive to the first count; and on counts five, six, and seven, sexual assault in the third degree and two counts of risk of injury to a child, the court sentenced the defendant to five years concurrent with the first count.

[7] The defendant claims that the evidence was insufficient evidence with respect only to counts four and five of the substitute information. Count four charged the defendant with one count of sexual assault in the second degree in violation of § 53a-71 (a) (1), alleging that he "did engage in sexual intercourse, to wit: penis to clitoris with another person to wit: [Y] and such person is thirteen years of age or older but under sixteen years of age." Count five charged the defendant with one count of sexual assault in the third degree in violation of § 53a-72a (a) (2), alleging that he "did engage in sexual intercourse with another person, to wit: [Y] whom the [defendant] knew to be related to him, to wit: his daughter."

[8] "[M]edical experts refer to the labia as an opening that can be penetrated." *State* v. *Albert*, supra, 252 Conn. 817 n.22. "Stedman's Medical Dictionary defines labia as the . . . two rounded folds of integument forming the lateral boundaries of the . . . external genitals . . . . [I]t is clear that the labia majora form the boundaries of a fissure, or opening, associated with the female genitals." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 809 n.17.

[9] Indeed, the defendant states in his brief that "[i]f one just follows the words [Y] used on the [witness] stand, sufficient evidence can be found. However, if one goes with common sense and anatomy . . . the evidence is insufficient." On appeal, we do not substitute our own judgment for that of the finder of fact if there is sufficient evidence to support the fact finder's determination of guilt. See *State* v. *Madore*, 96 Conn. App. 271, 283, 900 A.2d 64, cert. denied, 280 Conn. 907, 907 A.2d 93 (2006). In the present case, we conclude that, upon the facts so construed and the inferences reasonably drawn therefrom, the court reasonably could have found sufficient evidence of penetration.

[10] In doing so, the defendant claims that the present case is similar to *State* v. *Patterson*, supra, 131 Conn. App. 65. In that case, the defendant was charged with risk of injury to a child for placing a small amount of hot sauce in a cup and leaving it out where a two year old victim consumed it. Id., 69. In *Patterson*, we held that "[a]lthough a reasonable finder of fact could infer from his or her own observations and experience that hot sauce is spicy, and therefore inherently unpalatable to many individuals, one cannot assume that a small quantity is likely to result in injury absent additional evidence." Id., 80. The defendant compares that situation with the present case and argues that the state proved only that Y was given a small quantity of alcohol and that, in order to convict the defendant of risk of injury, the state was required to prove the actual amount of alcohol provided to Y. We disagree. *Patterson* is inapplicable to the present case because "[u]nlike marijuana and other drugs, hot sauce is not a controlled substance." Id. Providing alcohol to minors is an equally inapposite comparison to hot sauce, as we have previously noted that giving a teenage girl liquor involves furnishing the underage victim with a mind-altering substance, which is harmful to her physical health and induces her to lose self-control. See *State* v. *Mancinone*, 15 Conn. App. 251, 277, 545 A.2d 1131, cert. denied, 209 Conn. 818, 551 A.2d 757 (1988), cert. denied, 489 U.S. 1017, 109 S. Ct. 1132, 103

L. Ed. 2d 194 (1989).

The defendant then briefly argues that he is allowed to provide alcohol to his daughter under General Statutes § 30-86. This statute is inapplicable in the present case, as fully discussed in part II of this opinion.

[11] "[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis omitted; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[12] General Statutes § 30-86 (b) (3) provides in relevant part: "The provisions of this subsection shall not apply . . . (C) to a shipment or delivery made to a minor by a parent, guardian or spouse of the minor, provided such parent, guardian or spouse has attained the age of twenty-one and provided such minor possesses such alcoholic liquor while accompanied by such parent, guardian or spouse."

[13] "The sacramental use of wine has been an integral part of the ceremonial ritual of many of our religious sects from early colonial times. In enacting the predecessor of § 30-86, it is to be presumed that the legislature was aware of such religious rites and customs and there was no need to state as an exception to the literal operation of the law activities such as these, and other wholesome social customs mentioned by the defendants, in order to exclude them from the law's proscription. Nor, may it be said, is the law powerless to exert its force in situations where, under guise of religion, indulgence is sought in acts offensive to law and morality alike, in the disingenuous belief that they are constitutionally protected." *State* v. *Hughes*, supra, 3 Conn. Cir. Ct. 196–97.

[14] The defendant compares the present case to *State* v. *Perruccio*, supra, 192 Conn. 154. This case is plainly distinguishable. The court in *Perruccio* found that § 53-21 was unconstitutionally vague as applied to the defendant because consensual sexual relations were permissible under General Statutes § 53a-73a (a) (1) (A), as the girl's age of fifteen years allowed her to consent to sexual activity at the time the events occurred. Id., 163–65. The court thus concluded that fair notice of the statutory requirements of § 53-21 was not afforded to the defendant because the activity was permitted under another statute. *Perruccio* is not applicable in the present case because, as previously stated, the defendant's activities, under these factual circumstances, were not permitted under § 30-86. See *State* v. *Springmann*, supra, 69 Conn. App. 407–408.